**STATE of Tennessee, Appellee,**

v.

**Thurman Pete ROLLAND, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

April 29, 1992.

Permission to Appeal
by Supreme Court
July 27, 1992.

John E. Rodgers, Jr., Nashville, for appellant.

Charles W. Burson, Atty. Gen. & Reporter, Clinton J. Morgan, Sp. Asst. Atty. Gen., Nashville, Victor S. Johnson, III, Dist. Atty. Gen., Roe Ellen Coleman and Roger Moore, Asst. Dist. Attys. Gen., Nashville, for appellee.

## OPINION

SUMMERS, Judge.

This case involves an appeal as of right from verdicts of guilty on four counts of armed robbery and twelve counts of aggravated kidnapping. The appellant, Thurman Pete Rolland, challenges his aggravated kidnapping convictions as well as the consecutive sentences entered by the trial court.

Appellant's convictions arise from events taking place on three separate nights during December of 1988. Since appellant challenges his twelve aggravated kidnapping convictions, a summary of the facts presented at trial is essential to a resolution of the issues presented.

## FACTS

In the latter part of 1988, the appellant was employed at a Wendy's fast food restaurant in Nashville, Tennessee. One of his duties as an employee of the restaurant was to assist in closing the business at night. After business hours, each Wendy's Restaurant employs a crew of approximately four people, including a manager, to clean the restaurant and set it up for the following day. The appellant was a member of one of these crews. He does not now dispute the fact that he committed armed robbery of three different Wendy's restaurants. He only contests the kidnapping convictions arising from these robberies. Therefore, we will separate the facts of this case into the three armed robberies which took place on or about December 7, 19, and 30, 1988.

## THE EVENTS OF DECEMBER 7, 1988

Three witnesses testified about the events taking place at a Wendy's restaurant on Donelson Pike. These men had the responsibility of closing down the restaurant on December 7, 1988. At this time, Gary Lawson, an employee of Wendy's was 16 years of age. He had finished his duties at approximately 2:30 AM and was walking to his car in the restaurant's parking lot when he was approached by the appellant. The appellant, masked and armed, placed the barrel of a gun to Lawson's forehead. Lawson was directed to go back into the restaurant and as he headed to the door, he could feel the gun touching the back of his head. As the two men entered the door, Lawson's manager, Glen Hudson, was preparing to exit the building. Phillip Durr was standing beside Mr. Hudson. As the appellant and Lawson entered the building, the appellant pointed the gun at Mr. Hudson, apparently realizing that he was the restaurant's manager, and directed him to go to the office and open the safe. Hudson handed the appellant approximately $1,200.00. Appellant also took a $2,000.00 gold necklace from Mr. Lawson. At the time Hudson was opening the safe the appellant was pointing the gun directly at Hudson's head. Also during this time, he hit Mr. Durr on the side of the head with the gun saying "don't look at me."

After taking the money and the necklace, the appellant took the three men to the restaurant's freezer which is located inside and at the rear of a large walk-in cooler. When he discovered that the freezer and the walk-in cooler could not be locked, he placed the men in a small broom closet and pulled a large iron chili stove in front of the door. They stayed in the closet for approximately three and one-half minutes and then pushed the door open to free themselves. By then the gunman had left the restaurant, and the police were called.

As a result of these events, the appellant was convicted of two counts of robbery by use of a deadly weapon and three counts of aggravated kidnapping.

## THE EVENTS OF DECEMBER 19, 1988

Two witnesses testified about an armed robbery which took place at a Wendy's restaurant on Murfreesboro Road on December 19, 1988. For safety reasons, the general practice of the employees at that store was for everybody to leave the restaurant at the same time. However, on this cold winter evening, one of the workers, Ojiugo Ike, decided to leave the restaurant by herself in order to warm up her car. After attempting to start her engine, she returned to the restaurant. As she was walking back, she noticed the appellant following her; and she became frightened. She ran for the door, opened it, and attempted to lock it behind her. The appellant, however, was chasing after her and prevented the door from closing completely. He forced his way in, grabbed the woman by the collar of her shirt, and escorted her to the office where three other employees were situated. The manager on duty was Donald Neal. Mr. Neal testified that he first observed the appellant when he was holding Ms. Ike and pointing a gun to her head. According to Neal's testi-

mony, the appellant ordered him to open the safe and give him the money. As Neal was attempting to open the safe, the gunman punched him in the head with the gun and stated that he was going to shoot him. When Neal was able to open the safe, the appellant took approximately $1,700.00.

The appellant then ordered Neal and his three employees to get into the freezer. Once inside, he pointed the gun at them and ordered them to stay in the freezer for fifteen or twenty minutes. The freezer was manufactured so that it could not be locked without a key. Since appellant did not have a key, he attempted to barricade the door by piling certain unidentified objects in front of it. After about five minutes the employees pushed the door open at which point they entered the walk-in cooler. They listened for any noise and agreed that the appellant was probably gone. Therefore, they exited the cooler and summoned the police.

Because of appellant's involvement in these crimes, he was convicted of robbery by use of a deadly weapon and four counts of aggravated kidnapping.

### THE EVENTS OF DECEMBER 30, 1988

On December 30, 1988, the manager of the Wendy's restaurant on Lebanon Road received a phone call during business hours. After being told that the telephone was for him, he picked up the phone but no one was on the other end. He asked the person who answered the phone in the first place whether he recognized the voice of the caller. The person who answered the phone believed that the caller was the appellant. It was this Wendy's location that had hired the appellant two months earlier. The manager, Ross Arbogast, was concerned about this suspicious behavior. After the restaurant closed Mr. Arbogast and four other employees began to clean the restaurant and prepare it for the next day's business. All five workers were preparing to leave at approximately 2:00 AM. The first employee out the door was Mike Harvey who was 17 years old. As he exited the door the appellant (who had been hiding outside) put a gun to his face. Noticing some commotion, Mr. Arbogast immediately ran to his office and pushed a silent alarm.

He then returned with the rest of his employees. The appellant placed all of the employees, except Arbogast, in the restaurant's freezer. As with the other Wendy's restaurants, this freezer was in the rear of a larger walk-in cooler.

After ordering the four employees to remain in the freezer, the appellant forced Mr. Arbogast to open a safe which contained approximately $1,700.00. Although appellant was masked, Arbogast recognized him because of his physical shape and his unique voice. Furthermore, the appellant made certain derogatory statements which were the exact same statements made while working for Arbogast. Also, the appellant was calling Arbogast and one of the other employees by their first names.

After the appellant obtained the money, he forced Arbogast into the freezer with the rest of the employees. The temperature in the freezer was approximately zero degrees Fahrenheit. They stayed in the freezer between one and two hours. They were getting so cold that they decided to risk leaving the freezer and moving into the walk-in cooler. At one point they decided to leave this area and go to the office in order to call the police. Since they had not heard the police as of yet, they assumed that the silent alarm that was earlier pushed was not working properly. One of the employees, Curtis Brewer, went out first. Then Arbogast followed. As Arbogast was halfway out the door, Brewer came running back around the corner with the appellant pointing a gun at him. The appellant forced the five employees back into the freezer. He then pulled some stock shelves in front of the freezer door in order to block the employees inside.

They stayed in the freezer for another thirty minutes, but they were literally freezing in there. On the other hand, they were all afraid to leave the freezer because of the events which took place on their last attempt. They forced their way out of the freezer and back into the walk-in cooler. Mr. Arbogast instructed the other four to grab the handle of the door so the appellant could not enter. At the same time, Arbogast looked for some type of object that he could use to jam the door so that it could not be opened from the

outside. All he could find was a metal lettuce strainer. After that they simply sat in the walk-in cooler trying to decide their next action. While they were in the cooler they heard a single gunshot, which frightened them even more.

After remaining in either the freezer or the walk-in cooler for a total of five hours, the employees began to hear some commotion outside. Since the cooler's fans were on the entire time, it was difficult to determine what sounds they were hearing. They were of the opinion, however, that they were hearing a police radio. They heard someone yelling to them, but they were not sure whether the voice was that of the appellant or the police. Approximately fifteen minutes after hearing what they thought was a police radio, the wires to the cooler were disconnected and the fans stopped. They could hear people identifying themselves as the police, but they were still suspicious that the appellant could be attempting to trick them. For approximately forty-five minutes the police were trying to get the employees to open the cooler door, but they were too afraid to do so. As Mr. Arbogast testified, "[a]t this point, it was worse for me, because I had to make a decision whether or not to remove that bar from the door, because if it was the police, that would have been fine, but if it wasn't, you know, we probably would have been killed." Finally, the employees opened the door and the police took them outside and recorded their statements.

Actually, it was the S.W.A.T. team that had entered the Wendy's in order to rescue the employees. After freeing the workers from the cooler, however, they were initially unable to locate the appellant. They looked everywhere in the restaurant, but he was not to be found. Finally, they decided that the appellant must be hiding in the crawl space above the ceiling. They shot teargas into the space between the ceiling and the roof, but the appellant did not appear. Officers were forced to crawl into the ceiling in search of the appellant. The space was very dark, so one of the officers was forced to carry a weapon in one hand and a flashlight in the other. Eventually one of the officers noticed the appellant in the crawl space. He had

wrapped himself with insulation, apparently attempting to hide. His shoes were visible, however. They attempted to get him down verbally, but he would not respond. It was unknown at that time whether the appellant was still armed; so the officers, according to official policy, could not use deadly force. They decided to use an explosive distraction device in order to stun him. The device was referred to as a "stun grenade." They lobbed the grenade, which surprised the appellant and gave him sufficient encouragement to surrender.

As a result of this criminal episode, the jury found appellant guilty of robbery by use of a deadly weapon and five counts of aggravated kidnapping.

## I.

At the close of the state's case, the appellant made an oral motion to dismiss the kidnapping counts citing this Court's opinion in *State v. Dennis D. Anthony*, Knox County, C.C.A. No. 1277, 1990 WL 83416 (filed in Knoxville, June 21, 1990), appeal granted. In that case we held that there must be a "clear break in the events to support the separate crime[s] of kidnapping" and robbery. Slip Op. page 2. At the time of the instant trial, the *Anthony* opinion was pending appeal in the Supreme Court. The trial court ruled that the appellant's motion to dismiss the kidnapping counts was not meritorious. The court sided with the dissenting judge in the *Anthony* opinion. The dissenting judge expressed his opinion that the controlling case was *State v. Black*, 524 S.W.2d 913 (Tenn.1975). The Supreme Court in *Black* held that two separate criminal charges can be presented to the trier of fact even if the crimes occurred at substantially the same time and in the same course of a single criminal episode so long as the statutory elements of the two offenses are different and neither of the offenses is included within the other. *Id.* at 920. Since the *Anthony* case was pending appeal and the *Black* case was a published pronouncement by the Supreme Court, the lower court denied the appellant's request to dismiss the kidnapping charges.

After the filing of this appeal but prior to argument in this case, the Supreme Court rendered its decision in *State v. Anthony*, 817 S.W.2d 299 (Tenn.1991). In that case the Supreme Court joined two criminal appeals presenting similar issues. The high court held that the issue of whether robbery and kidnapping convictions can be upheld when both convictions arise out of the same criminal event, does not turn on an examination of a double jeopardy analysis. Clearly, "[t]he essential elements of kidnapping and robbery are ... separate and distinct, and simultaneous convictions on these two charges would not necessarily violate the rule in *Blockburger* [v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).]" The *"Blockburger* test" requires the court to examine whether each statutory provision requires proof of a fact which the other does not. The Tennessee Supreme Court adopted the *Blockburger* test in *State v. Black, supra.*

The *Anthony* Court held that a double jeopardy analysis was inadequate in resolving the question raised in that appeal. As a result it is inadequate to resolve the question raised in the instant appeal. The Court concluded that:

> [T]he better rule is an amplification of the test applied by the Court of Criminal Appeals in its opinions in these two cases, that is, whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support a conviction. [O]ne method of resolving this question is to ask whether the defendant's conduct "substantially increased [the] risk of harm over and above that necessarily present in the crime of robbery itself."

*Anthony*, 817 S.W.2d at 306. This holding was not based on a concern for constitutional protection against double jeopardy, but on an appreciation of the constitutional guarantee of due process. See Tenn. Const. Art. I § 8. We will therefore proceed in addressing the issues presented by the appellant with the proper focus on due process as mandated by our Supreme Court in *State v. Anthony*.

■ We will first address the criminal episode of December 7, 1988. After forcing the manager to retrieve the money from the restaurant's safe, the appellant placed three victims in a broom closet and placed a heavy object in front of the door to impede the victims' escape. Immediately after doing this, the appellant left the establishment. Almost no time elapsed before the three victims pushed the closet door open and called the police.

As mentioned above, the Supreme Court case of *State v. Anthony* actually consisted of two criminal appeals. The companion case was *State v. Martin*, 1990 WL 102365. In *State v. Martin* the defendant, brandishing a gun, entered an insurance agency and demanded the owner of the company and his secretary to give him any money that they had. Holding one of the victims by the arm, the defendant next ordered the two victims to go into the men's rest room and stay there. As soon as he heard the defendant go out the back door of the company, the owner hurried out of the rest room and contacted the proper authorities. The Court held that the victim's detention in the rest room was so incidental to the underlying robbery that a conviction for kidnapping could not stand. The Court stated that such a "brief and limited detention during flight is normal in the course of a robbery...." *Id.* at 307. Although the facts of that case can be distinguished from the instant criminal episode, we believe their similarity assists in the resolution of this case.

This appellant placed the victims in a closet for the sole purpose of facilitating his getaway. The restraint was for a very short period of time and resulted in no additional risk of harm. The detention of the three victims was incidental to the robbery itself. Thus, pursuant to *State v. Anthony*, we are of the opinion that counts 3, 4, and 5 of the indictment must be dismissed.

■ The facts surrounding the events of December 20, 1988 present a much more difficult scenario. Just as in the first robbery, the appellant demanded and received a large sum of money and thereafter placed all

employees who were on duty at the time into a closed area in order to facilitate his escape. In this case there were four employees and the area in which they were detained was a freezer. Again, the appellant piled objects in front of the door attempting to prevent the captives from getting out. After a very short period of time the victims were able to open the door and call the police.

The major distinction between this and the earlier robbery is the fact that the appellant placed his victims in a much more dangerous area of the restaurant. He attempted to block the door just as in the first robbery; however, had he been successful in locking them in the freezer, the outcome could have been very harmful if not fatal. We believe this detention falls under the portion of *State v. Anthony* which explained that a robber's conduct which substantially increases the risk of harm over and above that necessarily present in the crime of robbery subjects that person to an independent prosecution for kidnapping or, as in this case, aggravated kidnapping. We hold that the trial court did not err in refusing to dismiss the kidnapping counts relative to this criminal episode.

■ As for the events occurring on December 30, 1988, we believe that there is little doubt that appellant was subject to prosecution for aggravated kidnapping. He forcibly placed four victims into a zero degree freezer. He then ordered a fifth victim, Ross Arbogast, to open a safe and deliver a large sum of money to him. He then forced Arbogast to return to the freezer with the other victims. At one point, when the victims attempted to escape, the appellant placed a gun at the head of one of the victims and forced them back inside. He then pulled a large shelf down in front of the door in an attempt to block them inside. A 17-year-old victim of this crime testified that they "were very cold, very scared. It was at that point, after a couple of hours, I could hardly move my jaws because it was so cold." A 15-year-old victim of this crime testified that he was forced into the freezer and when asked how scared he was he replied, "[t]oo scared. I was just sitting there shaking real bad and everything...." One victim, who was 18 at the time of the crime, testified about his feelings when he was forced to stay in the freezer area. His reply was as follows: "Fear. I was afraid for my life. In fact we all were. We didn't know whether we were going to die, or whether we were going to live, you now. I got to the point where it made me sick. You know, I was scared."

The victims did not know it at the time, but the police, including the S.W.A.T. team, had surrounded the restaurant before the appellant was able to escape. Knowing that he had attempted to block his victims from leaving the deep freezer, the appellant did not concern himself with their safety. Rather, he spent his time attempting to destroy or hide evidence and to find a place to hide from the police when they made their inevitable entry. This confinement was certainly significant enough to warrant separate convictions for kidnapping. The appellant's behavior clearly produced a substantial increase in the risk of harm over and above his initial armed robbery. The appellant's convictions for aggravated kidnapping with respect to this criminal episode are affirmed.

## II.

■ The trial court held a sentencing hearing on January 24, 1991. At the conclusion of the hearing the court found five enhancement factors and no mitigating factors. Furthermore, the appellant was found to be a multiple offender and a dangerous offender pursuant to T.C.A. § 40–35–115(b). As a standard offender, the appellant was sentenced to ten years on each count. The court ordered counts 1, 3, 6, 7, 11, and 12 to run consecutively.

The appellant argues that the record does not support a finding that he is a multiple or dangerous offender and that consecutive sentencing was, therefore, inappropriate.

In our opinion, a finding that the appellant is a dangerous offender is unavoidable, and the Court need not look further in the statute to find authority for the court's method of sentencing. An offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high is, according to the statute and the landmark opin-

ion of *Gray v. State,* 538 S.W.2d 391 (Tenn. 1976), a dangerous offender. The evidence in the record supports that classification. This appellant used a loaded handgun; held that gun to the head of a number of his victims; had the hammer pulled back when he held the gun against at least one victim's head; struck another victim on the side of the head with the pistol while the hammer was pulled back and his finger was on the trigger; punched another victim in the head with the gun and threatened to shoot him; and fired one shot while the police had him trapped in the building during his third robbery. The evidence further shows that he attempted to lock his victims in the restaurant's freezers. Referring to this appellant as dangerous is a severe understatement.

Whether consecutive sentences should be imposed is a matter of discretion generally left to the trial court. We believe that the trial judge was justified in imposing consecutive sentences in the instant case. In fact, we believe that the effective 60–year sentence entered by the trial court was more than fair. In light of the fact that this Court has dismissed three of appellant's aggravated kidnapping convictions, we are invoking our authority to adjust the trial court's sentencing order. T.C.A. § 40–35–401(c)(2). Count 3 of the indictment, which was earlier dismissed by this Court, was one of the sentences ordered to be served consecutively. We order that count 15 of the indictment should be served consecutively to counts 1, 6, 7, 11, and 12. The effective sentence, 60 years, remains the same as entered by the trial court.

### III.

The only other matter which needs to be addressed by this Court concerns the actual judgment as entered in the record by the lower court. The court stated in that judgment that the conviction for count 2 of the indictment was for aggravated kidnapping, but the charge in that count was actually for armed robbery. In addition, the jury specifically found the appellant guilty of armed robbery with regard to count 2. The case is remanded for the court to modify its judg-

ment in accordance with the jury's verdict and this opinion.

### CONCLUSION

For the foregoing reasons, the convictions correlating to counts 3, 4, and 5 of the indictment are hereby dismissed. All the other convictions are affirmed, and the sentence is modified as stated herein. The case is remanded to the lower court for the record to be amended in accordance with this opinion. The aggregate sentence of 60 years shall remain in full force.

JONES and BIRCH, JJ., concur.