# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 19, 2005

## STATE OF TENNESSEE v. JOHNNY MAXWELL

**Appeal from the Criminal Court for Shelby County**
**No. 01-06250-55     J. C. McLin, Judge**

---

**No. W2004-00466-CCA-R3-CD  - Filed May 20, 2005**

---

A Shelby County Criminal Court jury convicted the defendant, Johnny Maxwell, of five counts of especially aggravated kidnapping, a Class A felony, and one count of aggravated robbery, a Class B felony.  The trial court sentenced the defendant as a Range I, standard offender to concurrent terms of twenty-four years for each especially aggravated kidnapping conviction, to be served at one hundred percent, and to eleven years for the aggravated robbery conviction, to be served consecutively to the other sentences for an effective sentence of thirty-five years.  On appeal, the defendant contends that (1) his especially aggravated kidnapping convictions cannot stand under State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), because the victims' detention was incidental to the aggravated robbery; (2) the trial court improperly commented on the evidence during the jury instructions; and (3) his sentences are improper in light of Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004).  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ALAN E. GLENN, J., joined.

Brett B. Stein, Memphis, Tennessee (on appeal), and James O. Marty, Memphis, Tennessee (at trial), for the appellant, Johnny Maxwell.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Karen Cook and Dean DeCandia, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the armed robbery of D'Bo's restaurant in Memphis, Tennessee, on December 7, 2000.  Brenda Douglas testified that on the night of the robbery, she was working as the night manager and counting the money in the office shortly after the restaurant closed at 10:00 p.m.  She said four other employees were also working.  She said that she was facing the wall when

two men entered the door to the office behind her and that as she turned around, she saw a gun in the hand of one of them. She said she immediately covered her face, dropped the money she was counting, and told them to take whatever they needed but not hurt anyone. She said that she did not look at the man with the gun and that he did not say anything to her. She said he placed the gun in her back and made her walk to the restaurant's cooler. She said that when she got inside, she saw the other four employees were also there. She said she obeyed the man's instructions to get into the cooler because he had a gun and might hurt her if she refused. She said she was uncertain how long they were inside the cooler but guessed it was about forty-five minutes. She said that it seemed like a long time but explained that they were afraid to exit the cooler because the men might still be in the restaurant. She said they stayed inside the cooler until they heard a customer holler. She said approximately five to eight hundred dollars was taken from the office.

On cross-examination, Ms. Douglas testified that the cooler was used to store chicken, carrots, celery, and salad dressings. She said that she did not know at what temperature the cooler was set and acknowledged that the door to the cooler cannot be locked from the outside or the inside.

Memphis Police Sergeant A.J. Kant testified that he received a call from D'Bo's restaurant shortly after arriving at work around midnight. He said that when he arrived at the restaurant twenty to thirty minutes later, other police officers had already checked the victims for injuries and talked to witnesses. He said that all of the employees but one were still present and that they appeared to be upset, nervous, and traumatized by the incident.

Nancy Wilder testified that she was working in the kitchen area at the back of the restaurant on the night of the robbery and that at around 10:00 p.m. that evening, two men with guns entered the rear door and ordered the employees into the cooler. She said that the first man wore a red hat and grey coat and that the second man wore a grey sweatshirt and ski mask. She said she spoke briefly with the man in the ski mask and described the gun he was carrying as long and black with a clip at one end. She said that the mask covered the majority of his face but that she could see some of his eye features and the bottom of his chin. She said he pointed the gun at her head and ordered her into the cooler. She said she called for the manager, Brenda, and he said, "What are you calling Brenda for? Brenda can't help you. You need to get in the cooler." She said he cocked the gun at that point and she entered the cooler.

Ms. Wilder said that she recognized the defendant's voice and visible facial features from an altercation she had with the defendant the previous evening. She said that while they were preparing to close the restaurant, the defendant entered with two other men, ordered some food, and began to complain because he thought the order was taking too long to prepare. She said that about five to ten minutes later, he received his food but before he left he said, "I'll be back." She said she identified the defendant from a set of photographs the detectives showed her. She said that she looked at twenty-five to thirty photographs and that she was one hundred percent certain the defendant was the man who held the gun to her head on the night the restaurant was robbed. A videotape recorded by the restaurant's surveillance system was played for the jury while Ms. Wilder narrated. The videotape showed the employees working and then being placed into the cooler at

10:50 p.m. She said that the employees all wore T-shirts and that none had coats or jackets with them. She said that she and an employee named Tonya entered the cooler first, followed by Termaine and Brian and, finally, Brenda. She said that after Brenda joined them, one of the robbers returned and asked if any of them had a cellular telephone. She said that he left the cooler and closed the door after they all answered no. Ms. Wilder said they were eventually released by a hungry customer who decided to find out what was taking so long to prepare his chicken. She said the customer searched the kitchen and then opened the cooler door. According to the videotape, they were released from the cooler at 11:24 p.m. She said that none of the employees tried to leave the cooler any sooner because they were afraid of being shot.

On cross-examination, Ms. Wilder acknowledged that she did not tell the police officers the defendant had a gun but explained that none of the employees gave statements on the night of the robbery. She acknowledged that the cooler did not have a lock and that it contained carrots, celery, and salad dressing but no frozen food to her knowledge. She said none of them dared to open the door to the cooler after being placed inside.

Termaine Taylor testified that he was working at D'Bo's the night of the robbery and that he was fifteen or sixteen years old at the time. He recalled that two men came in the back door and forced two female employees, Nancy and Tonya, into the cooler at gunpoint. He said that the two men then instructed the rest of the employees to get in the cooler and that they followed the men's instructions. He admitted that he did not see either man possessing a weapon. He said that after all five of them were herded inside the cooler, they did not see the two men again that night but that they were too frightened to leave the cooler. He said they feared they would be shot and only left after a customer found them. He recalled one of the men asked if anyone had a cellular telephone. He said that he was unable to recognize either man from photographs shown to him and that he could not remember what they were wearing because he kept his head down. On cross-examination, Mr. Taylor testified that the robbery took place with customers in the restaurant and that the temperature in the cooler was not sufficiently low to store frozen food.

Tonya Bullock testified that she was working as the cashier at D'Bo's on the night of the robbery and that her duties included bringing the cash to the manager's office at the close of business. She said that she had delivered the money to the manager and was in the back of the restaurant washing dishes when the two men entered the rear door at approximately 9:45 p.m. She said that one of the men had a gun and that he pointed it at her and told her to get into the cooler. She said that she entered the cooler which was extremely cold. She said the employees huddled together in an attempt to stay warm. She said that she was hypersensitive to cold because she was anemic and that extremely low temperatures caused her to start shaking. She said no one attempted to leave the cooler because the door may have been guarded by a man with a gun. She said she did not want to die. She said that after a while, they heard someone yelling, "Where's my chicken?" She said that someone suggested she stick her head out of the cooler to check things out but that she refused. She said they cautiously stepped out after a customer opened the cooler door and found them. She said that when she saw the coast was clear, she left immediately and did not wait for the police. She said she was very upset by the incident.

On cross-examination, Ms. Bullock said that she saw only one gun and that the man holding it pointed it at her midsection when he ordered her into the cooler. She said that he was close enough to touch her with the gun but that she was unable to identify either robber from a photograph array.

Sharon Steward testified that she arrived at the D'Bo's restaurant between 9:30 and 10:00 p.m. the night of the robbery and ordered some hot wings but never received them. She said that while she and some other customers were waiting for their orders, they began to smell chicken burning. She said that she had observed nothing unusual while waiting. She said that finally one of the customers left to investigate what was happening to the chicken and discovered the employees in the cooler.

Fred Taylor testified that he arrived at D'Bo's at approximately 9:30 p.m. on December 7, 2000, and that he ordered chicken. He said that forty minutes later, he noticed all of the employees had disappeared. He said he wanted his chicken and went searching for it. He said he noticed that the stove was on but that no one was working in the kitchen. He said he heard something, then saw someone peek out of the cooler and shut the door again. He said he got another customer to assist him and went back to check out the cooler. He said that he found all of the employees inside of it and that they were so frightened they would not come out right away. He said they informed him the restaurant had been robbed. He said he called the police.

Memphis Police Officer J.R. Howell testified that he investigated the robbery of D'Bo's. He said that he advised the defendant of his Miranda rights and that the defendant subsequently gave a statement in which he confessed to participating in the robbery. He said the defendant named his accomplices and admitted taking approximately $900.00 in cash. Regarding what happened before, during and after the robbery, the defendant stated the following:

> Me, Steve and Mario was just riding around in a 1999, F-150 pickup truck. This is the same truck me and Steve got locked up in. Me, Steve, and Mario was talking. Then I said I got something easier than that. I said we can rob the D'Bo's when they get ready to close. But I told Mario and Steve I couldn't be seen cause I used to work there and they would know me. Steve had the A – AP-9. It's a 9 millimeter. It looks like a machine gun. Steve parked the truck in the Franklin Park Apartments. Me, Mario, and Steve got out of the truck, and we walked out of the apartments. We jumped this lady's gate, and we to [sic] D'Bo's through the back way.
>
> . . . .
>
> Steve and Mario went into the back door at the same time. I knew the back door would be open because I used to work there. I stood outside at the back door until Steve and Mario put everybody in the

freezer. Then Mario and Steve told me to come on. I ran into the
office and grabbed the little gray safe off the desk and ran back out
the door.

On cross-examination, Officer Howell acknowledged the defendant claimed that he waited
outside while two other men entered the restaurant and that he was not carrying the weapon. During
redirect examination, he said the defendant admitted that he told his accomplices D'Bo's would be
an easy target and that he knew this because he used to work there.

## I. MERGER OF KIDNAPPING CONVICTIONS

The defendant contends that the detention of the restaurant's employees in the cooler was
intended only to facilitate his escape and was, therefore, incidental to the robbery. He argues that
because the door to the cooler was not locked or blocked, the victims could have left the cooler
whenever they wanted and their confinement did not warrant separate convictions for kidnapping
under Anthony. The state contends that because the victims' confinement in the cooler prevented
them from summoning help and increased their risk of harm, separate convictions for kidnapping
are supported by State v. Dixon, 957 S.W.2d 532 (Tenn. 1997), which refined the test provided in
Anthony.

Anthony provided the due process test for deciding whether a separate conviction for
kidnapping can be sustained when a defendant is also convicted of a crime, like robbery, in which
detention of the victim necessarily occurs. See Anthony, 817 S.W.2d at 300-01. The court said the
test is "whether the confinement, movement, or detention is essentially incidental to the
accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping,
or whether it is significant enough, in and of itself, to warrant independent prosecution . . . and
support such a conviction." Id. at 306. The court also noted that one method of resolving the issue
"is to ask whether the defendant's conduct 'substantially increased [the] risk of harm over and above
that necessarily present in the crime of robbery itself.'" Id. (quoting State v. Rollins, 605 S.W.2d
828, 830 (Tenn. Crim. App. 1980)).

In State v. Dixon, 957 S.W.2d 532 (Tenn. 1997), the supreme court refined the Anthony test
and held that for the movement or confinement beyond that necessary to commit the concurrent
felony, the question becomes "whether the additional movement or confinement: (1) prevented the
victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a
significant danger or increased the victim's risk of harm." Id. at 535. The defendant in Dixon
dragged his victim thirty or forty feet from the illuminated sidewalk into some shrubbery and then
sexually assaulted and brutally beat her. He was subsequently convicted of aggravated kidnapping,
attempted sexual battery and aggravated assault. The court determined that the removal of the victim
into the foliage was beyond that necessary to complete either the attempted sexual battery or the
aggravated assault and concluded that the defendant dragged the victim into the shrubbery to avoid
detection, an act which also substantially increased the victim's risk of harm. Id.

Anthony and Dixon were decided to prevent the injustice which would occur if a defendant could be convicted of a kidnapping offense when the only restraint used was that necessary to commit another felony, such as rape or robbery, for which the defendant was also convicted. Applying the test established in those cases, though, we believe the restraint used by the defendant in this case was beyond that necessary to commit the robbery. Ms. Douglas testified that when confronted by the two robbers, she immediately covered her face, dropped the money, and told them to take whatever they needed. However, she was then ordered to the cooler at gunpoint, where four other employees were also confined and where they all remained for more than thirty minutes. Their detention was neither limited nor brief. The defendant argues that the cooler was not locked or blocked and, therefore, that the victims could have left the cooler at any time. The record reflects otherwise. Four victims testified that they were too frightened to leave the cooler. Moreover, it is unknown how much longer the victims would have remained confined but for their rescue by an inquisitive customer.

In this regard, we conclude that the defendant's actions (1) prevented the victims from summoning help, (2) lessened the defendant's risk of detection, and (3) increased the victims' risk of harm. See id. The victims' confinement made it difficult if not impossible for them to summon help. Two victims testified that at the beginning of their confinement, the defendant or his accomplice asked if any of the victims had a cellular telephone with them, implying that they wanted to prevent the victims from calling the police or anyone else for assistance. Although the restaurant still had customers inside the building waiting for food, the victims were too frightened to leave the cooler and could not be seen from where the customers were waiting. Accordingly, their confinement in the cooler also prevented the customers from discovering what had occurred and thereby lessened the defendant's risk of detection before he and his accomplice could escape. Given the cold temperature and indeterminate length of time the victims might have been confined but for their unwitting rescue, the defendant's action also increased the risk of harm to the victims.

The defendant relies on State v. Rolland, 861 S.W.2d 840 (Tenn. Crim. App. 1992), to support his contention that separate kidnapping charges are not warranted because he placed the victims in the cooler only to facilitate his escape and did not block the cooler's door. In Rolland, the defendant was convicted of four counts of armed robbery and twelve counts of aggravated kidnapping arising from three criminal episodes. On appeal, this court dismissed the three counts of aggravated kidnapping arising from the first episode, in which the defendant placed the victims in a broom closet to facilitate his escape. Even though the defendant placed a heavy object in front of the closet door, almost no time elapsed before the victims pushed the door open and called the police. Id. at 844. The court affirmed the convictions in the other episodes in which the defendant confined his victims in a freezer and barricaded the door.

The defendant's reliance on Rolland is misplaced. The conclusions in Rolland were based on the supreme court's decision in Anthony, and the test provided in Anthony was subsequently refined by the restrictions developed in Dixon. We do not believe that the detention of the victims in the first episode committed by the defendant in Rolland would survive the Dixon test because his

placing the victims in the broom closet, albeit for a short time, prevented them from summoning help and also lessened his risk of detection.

As the court in Dixon noted, our current aggravated kidnapping statute does not require a particular distance of removal or any particular duration or place of confinement. Dixon, 957 S.W.2d at 535. Especially aggravated kidnapping is committed by one who knowingly removes or confines another "so as to interfere substantially with the other's liberty" and accomplishes the offense with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it is a deadly weapon. See T.C.A. § 39-13-305. Moreover, it is the purpose of the removal or confinement and not the distance or duration that supplies a necessary element of aggravated kidnapping. Dixon, 957 S.W.2d at 535. Because the confinement of the five victims in this case was beyond that necessary to accomplish the robbery and because it also prevented the victims from summoning help, lessened the defendant's risk of detection, and increased the victim's risk of harm, we conclude that the detention of the victims was not merely "incidental" to the robbery. The defendant is not entitled to relief on this issue.

## II. JURY INSTRUCTIONS

The defendant contends that the trial court improperly commented on the evidence and invaded the province of the jury when it instructed the jury that "evidence of a confession has been introduced in this case," referring to the defendant's statements to Officer J.R. Howell. The state responds that the instruction given the jury was not an impermissible comment on the evidence. However, the record does not reflect that the defendant raised a contemporaneous objection to the jury charge at trial or that the issue was raised in his motion for new trial. Accordingly, the issue is waived. See T.R.A.P. 3(e); State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005).

## III. SENTENCING

The defendant contends that the trial court violated Blakely during sentencing by applying his being a leader in the commission of the offenses as an enhancement factor and imposing consecutive sentences based on facts not found by the jury. The state contends that by failing to object to the application of the enhancement factor in the trial court, the defendant had waived this issue on appeal and that Blakely does not apply to consecutive sentences. The state further argues that even if the issue is not waived, any error is harmless beyond a reasonable doubt because the evidence overwhelmingly supports the trial court's finding that the defendant was a leader in the commission of the offenses.

In Blakely, the United States Supreme Court held that other than prior convictions, any facts not reflected in the jury's verdict and used to increase a defendant's punishment above the presumptive sentence must be admitted by the defendant or found by the jury beyond a reasonable doubt. 542 U.S. at ____, 124 S. Ct. at 2537. However, the Tennessee Supreme Court has recently held that failure to raise Blakely in the trial court waives the issue and that, in any event, Tennessee's sentencing procedures do not violate the Sixth Amendment right to trial by jury described in Blakely

and United States v. Booker, _____ U.S. _____, 125 S. Ct. 738 (2005). See State v. Edwin Gomez and Jonathan S. Londono, No. M2002-01209-SC-R11-CD, Davidson County, ___ S.W.3d ___ (Tenn. April 15, 2005). Accordingly, the defendant's reliance upon Blakely is misplaced. Otherwise, we see no problem with the trial court's application of enhancement factors or its imposition of consecutive sentences. The defendant is not entitled to relief on this issue.

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, JUDGE