# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 18, 2000

## STATE OF TENNESSEE v. JOHN CHARLES JOHNSON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 98-D-2519      J. Randall Wyatt, Judge**

---

**No. M2000-00529-CCA-R3-CD - Filed March 1, 2001**

---

Defendant John Charles Johnson was convicted by a Davidson County jury of second degree murder, facilitation of aggravated kidnapping, and especially aggravated robbery. The trial court sentenced Defendant to twenty-five years for second degree murder, five years for facilitation of aggravated kidnapping, and twenty years for especially aggravated robbery. The trial court further ordered that Defendant's sentences for second degree murder and facilitation of aggravated kidnapping be served consecutive to each other and concurrent with Defendant's sentence for especially aggravated robbery, resulting in an effective sentence of thirty years. Defendant raises the following issues in this appeal: (1) whether the evidence was sufficient to support his three convictions; (2) whether the trial court erred in not granting Defendant's motion for judgment of acquittal on the ground that the testimony of a co-defendant was uncorroborated; (3) whether the trial court erred in not allowing Defendant to play a tape containing exculpatory statements; (4) whether the trial court erred by failing to charge the lesser-included offenses of voluntary manslaughter and facilitation to commit voluntary manslaughter; and (5) whether the length of the sentences imposed by the trial court were proper. Following a review of the record, we affirm the judgment of the trial court concerning Defendant's convictions and the lengths of Defendant's sentences. We reverse the trial court's order of consecutive sentencing and remand for a new hearing solely on the issue of concurrent or consecutive sentencing.

### Tenn. R. App. P. 3 Appeal as of Right;
### Judgment of the Criminal Court Affirmed, in part, Reversed and Remanded, in part.

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

John E. Rodgers, Jr., Nashville, Tennessee, for the appellant, John Charles Johnson.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Katrin Miller, Assistant District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Facts

Defendant John Charles Johnson was indicted by the Davidson County Grand Jury on charges of premeditated first degree murder, murder committed during the perpetration of robbery, aggravated kidnapping, and especially aggravated robbery. The charges resulted from an incident that occurred on August 16-17, 1998 when Defendant and his friend, Jeremiah Hailey, lured Hailey's ex-brother-in-law to a secluded area on a pretext and killed him. Hailey and Defendant were arrested the next day. Hailey pled guilty to second degree murder and was sentenced to thirty years. Pursuant to his plea agreement, Hailey testified as a witness for the State at Defendant's trial.

At Defendant's trial, Jeremiah Hailey testified that the idea to murder his ex-brother-in-law, Joe Dotson, originated as a joke between Hailey and Defendant in the evening on August 16, 1998. The events leading to the murder began earlier that afternoon. Hailey had asked Defendant to meet him at a bar near Opryland to drink beer and watch the races. After consuming numerous beers, Hailey and Defendant went to O'Charley's restaurant and continued to drink beer for another hour or so. At approximately 9 or 10 p.m. they headed to a club called Silverado's where the beer was free. The two men drank until approximately midnight. Hailey testified that he and Defendant drank similar amounts of alcohol and that Defendant did all of the driving that evening.

Hailey testified that after he and Defendant left Silverado's, their conversation turned to the subject of Hailey's sister, Wendy, and her ex-husband, Dotson. Hailey testified that Dotson was "always into something. And he slapped [his sister] around, blacked [sic] her eye, here and there. And they was always having problems." Dotson and Wendy were divorced but had recently decided to get back together. Hailey told Defendant, jokingly, that they "ought to pop him." Hailey testified that he does not remember the exact conversation, only that Defendant basically agreed and said "let's do it." Hailey and Defendant then drove to Hailey's house to pick up his gun. On the way, they fabricated a story for the purpose of enticing Dotson to accompany them to Old Hickory lake.

Hailey testified that after they picked up the gun, Hailey and Defendant drove to Wendy's house where Dotson was living at the time. It was approximately 1:00 a.m. when they arrived, and quite a few people were at the house. Hailey and Defendant went inside. Hailey found Dotson and told him the story that he and Defendant had fabricated, i.e, that Hailey and Defendant met some Mexicans that afternoon who wanted to sell a stolen car with rims on it. (Hailey testified that Dotson "was always buying something stolen, or if it had rims on it.") They told Dotson that the Mexicans were waiting for them at Old Hickory lake and, if Dotson was interested in purchasing the car, he should come with Hailey and Defendant to the lake and meet them. After hearing their story, Dotson agreed to go. The plan was to drive Dotson to the lake and kill him there–nothing else had been discussed.

Hailey testified that Defendant drove the three of them to the lake where they waited for thirty to forty-five minutes before Dotson began to show signs of aggravation. When Dotson asked what was going on, Hailey reached for his gun and started shooting at him. Dotson started running. Hailey fired three shots. Two bullets hit Dotson--one in the shoulder and one in the hip. Dotson jumped into the lake. Defendant jumped in on top of him, grabbed his head and held it under the water for a minute or two. When Defendant came back onto the shore, he and Hailey discussed what they should do next. Dotson was still face down in the water. They decided to move Dotson to the other side of the lake so that the current from the river would carry the body away. Defendant grabbed Dotson's body and dragged it from the water, but it took both of them to hoist it into the trunk of the car. Although Hailey did not observe Defendant take any money from Dotson at this time, Defendant later admitted to Hailey that he had removed some money from Dotson's sock. Defendant told Hailey that he did not want it, however, and gave Hailey half of what he took. Hailey also testified that neither of them beat Dotson, so Hailey could not explain how blood became spattered onto the inside of the trunk of Defendant's car. They were "both crying and just in a mess" at this point.

Hailey testified that it took him and Defendant a couple of minutes to get to the other side of the lake. They unloaded Dotson from the trunk, put him in the water, and gave his body a shove. Dotson was unconscious at this point, and they both thought he was dead but neither of them knew for certain. On the way home, Hailey and Defendant both became concerned about getting into trouble, so they threw the gun into Stone's River and discussed what they should say to the police. Hailey and Defendant decided to tell the police that they drove to the lake with Dotson to meet a group of Mexicans but left without him. They planned to say that after they arrived, Dotson discovered that he knew one of the Mexicans and became engrossed in a conversation with him. Hailey and Defendant then left the lake, assuming that someone there would give Dotson a ride home. When Hailey arrived at home at approximately 2:30 or 3:00 a.m., he woke up his mother and confessed to killing Dotson.

The next morning, Hailey received a phone call from Defendant. Hailey cautioned Defendant to "stick to th[eir] story." Later, a police officer arrived at Hailey's house to inform them of Dotson's death. The officer also wanted someone to identify Dotson's body. After Hailey told the officer the story about him and Defendant driving with Dotson to the lake to meet some Mexicans, the officer sent detectives to talk with Hailey again and investigate further. The detectives wanted Hailey to come to the police station and to bring Defendant with him. Both agreed to cooperate. Hailey's mother gave them a ride to the police station later that day. In his first interview with the police, Hailey repeated the false story about the Mexicans that he and Defendant had previously agreed upon. Later, in a taped statement, he confessed to killing Dotson.

Robbie Taylor, Dotson's cousin, testified that he lived with Dotson and Wendy prior to Dotson's death and was present when Defendant and Hailey came by to see Dotson in the early morning of August 17, 1998. Taylor testified that he was in the living room playing a game on the television when they arrived. Dotson was in bed at the time. Defendant and Hailey asked Taylor to wake Dotson up, but Taylor refused. Hailey then went to wake Dotson. Defendant stayed in the

living room. Five or ten minutes later, Dotson and Hailey emerged from the bedroom talking about a car at the lake. Taylor remembers that Defendant participated in the discussion. When the three of them left, Taylor went to bed.

Steve Underwood, a Metropolitan Nashville Police Department patrol officer, testified that he was on duty the morning of August 17, 1998. At approximately 7 a.m. that morning, Underwood received a call to investigate a report of a body that fishermen had discovered in the river at Old Hickory lake. When Underwood arrived, he observed a body floating face down in the water. Paramedics had already pronounced the person dead but did not move the body. Underwood phoned his supervisor, then notified the police department's Homicide and Identification Unit which then assumed responsibility for the investigation.

Detective Brad Putnam, an officer with the Metropolitan Nashville Police Department, testified that he was a member of the "murder squad" assigned to investigate Dotson's death. When Putnam arrived at the lake at 7:45 a.m., Dotson's body was still floating face down in the water. Putnam observed that Dotson also had injuries to his back. During his investigation, Putnam was told that some of the attendants working the previous night had reported hearing gunshots by the parking area at approximately 3:00 a.m. At the parking area, Putnam discovered two .25 caliber shell casings, two live .25 caliber rounds, one .25 caliber projectile, and a white sock which appeared to match another sock recovered near the body. Shortly thereafter, the victim's fingerprints were identified as those of Michael Joseph Dotson. Detectives Roland and Vogel were sent to notify the family.

When Putnam returned to the murder squad office, Detectives Roland and Vogel informed him that Hailey and Defendant were allegedly the last persons to see the victim alive early that morning. In accordance with standard procedure, the detectives had already informed the two men that Putnam would like statements from them. As a result, Hailey and Defendant showed up in Putnam's office at approximately 4:00 p.m. that afternoon. Putnam interviewed Hailey first, taped his statement, then did the same with Defendant. Although neither were suspects at the outset, this status began to change soon after both statements were heard. Major discrepancies between the two stories emerged, including the number of Mexicans who supposedly showed up at the lake, the time they arrived, and their physical descriptions.

After Putnam's initial interviews with Hailey and Defendant were completed, Putnam sent Defendant to see an officer named Detective Bernard for a second interview and polygraph test (which Defendant agreed to take). Bernard never reached the point where a polygraph was appropriate, however. Defendant incriminated himself during the introductory interview with Bernard, after which, his status changed from witness to suspect. Defendant was then placed under arrest, and Putnam conducted a second interview before which he advised Defendant of his constitutional rights and requested a second statement. Putnam testified that Defendant waived his rights and, in the second statement, confessed. Defendant also informed Putnam that Hailey had beaten Dotson as they pulled him from the trunk of the car at the river. (Hailey admitted beating Dotson when he talked with Putnam, but denied it later during his testimony at trial.) Putnam then

requested that Defendant's car be processed in an attempt to discover trace evidence such as blood, hair and fingerprints.

Charles Ray Blackwood, a Metro Police Department officer assigned to the identification section, testified that his job was to process crime scenes for evidence. On August 19, 1998, Blackwood received a request from Detective Putnam to process Defendant's car. As a result, Blackwood recovered numerous samples of blood which appeared as spatters, primarily in the area of the trunk. No blood spatters were discovered on the cover side of the trunk lid, however, which indicated that the trunk lid was up at the time the blood was shed onto the other parts of the vehicle. Blackwood performed numerous presumptive tests for blood, then sent the samples to the Tennessee Bureau of Investigation for further testing in accordance with standard departmental procedure.

Special Agent Constance Howard testified that she was employed with the Tennessee Bureau of Investigation crime laboratory as a forensic scientist specializing in DNA analysis. Howard received a request from Putnam to analyze various blood samples collected in connection with the Dotson murder. The tests confirmed that the blood samples given her belonged to the victim, Dotson.

Dr. John E. Gerber, an Associate Medical Examiner for Davidson County, testified that his specialty was forensic pathology. Dr. Gerber performed an autopsy on Dotson's body which revealed multiple causes of death: numerous blunt force injuries to the head, gunshot wounds to the left arm and flank, and drowning. The external exam of the body showed multiple lacerations to the head and superficial abrasions to the face and back. Dr. Gerber explained that laceration wounds were deeper than mere abrasions. The lacerations on Dotson's head tore his skin down to the skull bone. Dr. Gerber further testified that significant force was required to pierce 3/4 inch of scalp tissue and expose the skull. Even so, Dotson's lacerations were not life threatening in themselves–it would probably take a person with similar injuries several hours to bleed to death. Dr. Gerber was unable to determine whether Dotson suffered loss of consciousness during the beating.

Dr. Gerber testified that Dotson's autopsy also revealed two bullet wounds, one on his left flank and the other on the left side of his arm. The wound on his flank was superficial, only injuring skin, soft tissue and skeletal muscle. By contrast, the arm wound was more serious because it fractured a major bone and injured many more blood vessels. Yet, similar to the head wounds, Dotson's bullet wounds were not life threatening in themselves.

Dr. Gerber was asked why the cause of Dotson's death was listed as three different reasons when two of them, the bullet wounds and the head injuries, were characterized as non-life threatening. Dr. Gerber responded that, in this case, there was a series of events–three separate types of injuries–which must be considered together. Dr. Gerber explained that when Dotson arrived at the morgue he had an extreme amount of foam around his nose, mouth, and the most distal branches of his lungs, which indicated death by drowning. This evidence was merely helpful, however, not specific. For example, since it typically takes four to six minutes to lose consciousness when drowning and a person can usually be revived from that state, if the bullet wound in Dotson's left

arm had incapacitated Dotson so that he could not get out of the water within that time, the arm wound could be classified a cause of death. Dr. Gerber further testified that he could not tell from the evidence whether Dotson's head was actually held under water.

Dr. Gerber was shown photographs of the circle of blood spatter discovered on the trunk area of Defendant's car and asked whether a person would have to be alive in order for the blood spatter to appear as portrayed in the photos. Dr. Gerber answered yes, and explained that the heart would have to be pumping in order for blood to reach the distances shown in the photos. Dr. Gerber further explained that when a person is dead, the blood vessels do not contain the amount of pressure necessary to spatter the blood a great distance if or when the vessel is severed. On cross-examination, Dr. Gerber admitted that blood spatter is extremely controversial and it is difficult to be specific. Dr. Gerber illustrated with the following: "if you're going to take a huge amount of pressure and slam a person with an axe or something that's dead [sic], yes, the blood could spatter quite significantly." In general, a pumping heart causes pressure so that blood will usually spatter much more when a person is alive than when dead.

The defendant, John Charles Johnson, testified that he did not kill Joe Dotson and further, that on August 16, 1998 he had no knowledge that his friend, Jeremiah Hailey, wanted to kill Dotson. Defendant testified that at 12:00 noon on August 16, 1998, Defendant was sitting at home with his parents. They were preparing Sunday dinner when Defendant received a phone call from Hailey. Hailey wanted Defendant to join him for drinks and to watch the races. By the time Defendant arrived, Hailey was visibly intoxicated. Defendant ordered a beer and continued to drink with Hailey for the remainder of the day. When they left the bar, they drove to O'Charley's restaurant and later to a club called Silverado's. At Silverado's they split up for a while, but then left together at approximately midnight in search of "something to do." By this time they were both highly intoxicated. They stopped at the top of Percy Priest Dam and talked about life in general for a while. Eventually, the conversation turned to the subject of Hailey's sister. Hailey told Defendant about his sister's house. Hailey said he was helping to "get it ready" and invited Defendant to come and see it. Because they had nothing else to do, Defendant agreed.

Defendant testified that on the way to Hailey's sister's house (where Dotson was living at the time), Defendant and Hailey stopped by Hailey's house to get money for gas. Hailey was inside for only a couple of minutes. When they finally arrived at Hailey's sister's house, Dotson answered the door, let them inside, and then disappeared with Hailey into the back of the house. Defendant waited in the living room with Dotson's cousin. Defendant testified that he could only vaguely hear the conversation going on between Dotson and Hailey. When Hailey and Dotson returned to the living room, Hailey asked Defendant whether he would mind driving them to Old Hickory lake to see a car. This was the first that Defendant had heard anything about a car, but he agreed.

Defendant testified that during the drive to the lake, Hailey and Dotson were laughing together and everything seemed fine between them. When they arrived and no one was there to meet them, they all got out of the car to wait. About 4 a.m., Defendant suggested that they give up and go home. Defendant started walking back to the car. Then Dotson expressed his displeasure that

the Mexicans did not show up, and Hailey responded "f--- you." When Dotson seemed surprised at this outburst and asked what was going on, Hailey replied "I'm going to kill you." Dotson acted like he did not believe Hailey until Hailey started shooting. Defendant yelled at Hailey to stop. Dotson was running at this point, but he was running toward Defendant. Defendant did not want to get shot, so he pushed Dotson away from him and hid behind the car. Hailey chased Dotson to the edge of the water, still firing at him, and Dotson jumped into the lake.

After Dotson ran into the water, Hailey walked back to where he first started firing and proceeded to pick "things" up off the ground. Dotson's body was lying in the water. It appeared to be shaking for a while, then quit. Defendant ran into the water and pulled Dotson out. He did not hold his head under the water. Dotson looked dead at this point. Hailey argued that Dotson was not dead, but Defendant thought otherwise. Defendant wanted to leave, but Hailey said "No, we're not going to leave him." Rather than argue and risk getting shot himself, Defendant helped Hailey load Dotson into the trunk of the car. They drove to the boat dock on the other side of the lake, backed down the ramp, and started to unload Dotson from the trunk when a large amount of money fell out of Dotson's sock. Hailey picked the money up, put it in his pocket, then started beating on Dotson. When they finally got the body into the water, they gave it a shove and then got back into the car and drove away. Hailey threw the gun into Stone's River on the way back. Hailey tried to give Defendant half of Dotson's money when they arrived at Hailey's house. At first Defendant refused, but Hailey was insistent. Defendant took some of the money, but threw it out the car window on his way home.

Defendant testified that Hailey's mother gave Defendant and Hailey a ride to the police station the next day. On the way, the three of them discussed what they would tell the police. Ms. Hailey warned them that they needed to "get [their] stories straight." Their plan was to corroborate each other's version of the incident and, hopefully, stay out of jail. Defendant and Hailey decided to tell the police that they left Dotson at the lake with some Mexicans who wanted to sell him a stolen car. Consequently, Defendant's first statement to the police concerned the Mexicans and was false. Defendant testified that his second statement to the police and his testimony in court were the "true" versions of the incident.

During cross-examination, Defendant admitted that he did not speak with any Mexicans at Silverado's but said that Hailey may have. If Hailey did, however, he neglected to tell Defendant about the conversation. The State then referred Defendant to a portion of his second statement, the "true" version, where Defendant described the Mexicans as follows: "[j]ust these guys we'd met. They were Mexicans. We met them at Silverado's." Defendant responded that this particular statement was taken "out of context."

Sheila Ashworth, Dotson's sister, testified that Dotson and Hailey's sister, Wendy, had divorced but that they had also reconciled before he was killed. Ashworth further testified that Wendy and Dotson were happy and had recently moved into a new home. Although the couple had "problems" and a history of breaking up, they always somehow got back together. Wendy committed suicide a year after Dotson's murder.

## II. Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to support his convictions for second degree murder, facilitation of aggravated kidnapping, and especially aggravated robbery.

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Shepherd, 902 S.W.2d 895, 903 (Tenn. 1995) (citing Jackson v. Virginia, 443 U.S. 307, 322-25 (1979)); Tenn. R. App. P. 13(e). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this Court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Nor may this Court reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Furthermore, a jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the jury verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences therefrom. Cabbage, 571 S.W.2d at 835. This Court may not substitute its own inferences for those drawn by the trier of fact from circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). A crime may be established by circumstantial evidence alone. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987). However, before an accused may be convicted of a criminal offense based only on circumstantial evidence, the facts and circumstances "must be so strong and cogent as to exclude ever other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971).

### A. Second Degree Murder

Regarding his conviction for second degree murder, Defendant argues that the State presented no proof that Defendant committed a *knowing* killing. Specifically, Defendant contends that his conduct was "not reasonably certain to cause the victim's death." Instead, Defendant maintains that Dotson's death was solely attributable to the actions of the co-defendant, Hailey. We disagree.

Under Tennessee law, second degree murder is: "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (1997). Knowing refers to a person "who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly ... when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b).

Granted, the evidence showed that it was the co-defendant, Hailey, who shot Dotson and also inflicted multiple lacerations to his head. Defendant was involved primarily in drowning the victim. Nevertheless, it is not necessary that Defendant's act or failure to act be the sole cause, nor the most immediate cause of the victim's death. State v. Richardson, 995 S.W.2d 119, 125 (Tenn. Crim. App. 1998) (citing State v. Roberson, 644 S.W.2d 696, 698 (Tenn. Crim. App. 1982)). It is only necessary that Defendant unlawfully contributed to it. Id.

The evidence adduced at trial concerning Dotson's death presented the jury with a credibility issue. The jury was required to choose between Defendant's claim that he tried to save Dotson's life and Hailey's testimony that Defendant held Dotson's head under water--conduct reasonably certain to cause death. After hearing the testimony and observing the demeanor of the witnesses, the jury believed Hailey and, thereafter, determined that Defendant was guilty of second degree murder beyond a reasonable doubt. The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the triers of fact. State v. Cribbs, 967 S.W.2d 773, 793 (Tenn. 1998).

Moreover, the evidence supports Defendant's conviction according to the principle of criminal responsibility. Tennessee Code Annotated § 39-11-402(b) provides that a person is criminally responsible for an offense committed by the conduct of another if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids or attempts to aid another person to commit the offense. . . ." The proof showed that Defendant actively participated in setting the stage (getting the victim to the secluded crime scene) as well as the subsequent cover-up. Defendant drove to and from the murder scene, helped dispose of the body, assisted in concealing evidence, helped fabricate a false story to tell the police and perpetuated the falsehood in later interviews with law enforcement personnel. The trial court charged the jury on criminal responsibility, which the evidence clearly supports. We conclude that when all of the evidence is viewed in the light most favorable to the State, as it must be, the evidence was sufficient for a rational jury to find beyond a reasonable doubt that Defendant knowingly killed Dotson. Defendant is not entitled to relief on this issue.

### B. Facilitation of Aggravated Kidnapping

Defendant further contends that the evidence does not support his conviction for facilitation of aggravated kidnapping and appears to present his evidence sufficiency issue in two parts. Defendant not only generally challenges the legal sufficiency to support his conviction, he also contends that because the restraint of the victim was for a very short period of time, no additional risk of harm resulted, and the kidnapping was "for the sole purpose of facilitating his getaway," his conviction cannot stand. In support of the latter contention, Defendant's brief cites State v. Rolland, 861 S.W.2d 840 (Tenn. Crim. App. 1992). The issue in Rolland concerned due process violations under State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). Thus, Defendant's second argument effectively contends that his conviction for facilitation of aggravated kidnapping violates his due process rights because the facts supporting that conviction were incidental to those facts supporting the other felony convictions. We address Defendant's two issues separately.

### 1. **Rolland** and **Anthony** Due Process Claim

In Rolland, the defendant's convictions resulted from three separate events. Our analysis of Rolland is concerned with the criminal episode that occurred on December 7, 1988. Specifically, during the course of this criminal event the defendant placed his victims into a broom closet after robbing them. Next he set a heavy object in front of the door to impede their escape. After the defendant left, almost no time elapsed before the victims pushed the closet door open and called the police.

On appeal, this Court found that the victims' restraint in Rolland was for the sole purpose of facilitating the defendant's getaway, lasted a very short time, and resulted in no additional risk of harm. This Court further determined that the detention was "incidental" to the robbery itself and thus, pursuant to State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), the defendant's indictments for aggravated kidnapping should be dismissed. Rolland, 861 S.W.2d at 844.

In Anthony, the Tennessee Supreme Court attempted to delineate exactly when criminal conduct, itself an element of or inherently part of a particular crime, should also be prosecuted as a separate crime. Anthony, 817 S.W.2d at 306-07. Anthony concerned two cases in which each defendant was convicted of both armed robbery and aggravated kidnapping for acts committed during a single criminal episode. See id. at 301-02. The test that evolved focused on whether the confinement, movement, or detention at issue was *essentially incidental to the accompanying felony* and not, therefore, sufficient to support a separate conviction for kidnapping, or whether it was significant enough, in and of itself, to warrant independent prosecution and, therefore, sufficient to support such a conviction. Id. at 306 (emphasis added). Deciding whether the defendant's conduct "substantially increased the risk of harm over and above that necessarily present in the [accompanying] crime ...." is helpful in resolving this question. Id. (quoting State v. Rollins, 605 S.W.2d 828, 830 (Tenn. Crim. App. 1980)).

The Anthony court concluded that the defendant's kidnapping convictions failed the above test because the victims' movement was limited to short distances within the general area, which was normal in character for the course of a robbery or "part and parcel to that offense," and the defendant's actions did not substantially increase the risk of harm to the victims. Id. at 307. Subsequent courts have applied Anthony to other combinations of crimes. See State v. Barney, 986 S.W.2d 545, 547-49 (Tenn. 1999) (aggravated sexual battery and rape of a child); State v. Gregory, 862 S.W.2d 574, 579 (Tenn. Crim. App. 1993) (rape, murder, and aggravated kidnapping). In State v. Dixon, 957 S.W.2d 532 (Tenn. 1997), our supreme court further refined the test in Anthony holding that, once the court determines that the movement or confinement [kidnapping] was beyond that necessary to consummate the act of the concurrent felony, the next inquiry is whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm. Dixon, 957 S.W.2d at 535.

Applying the Anthony test to the instant case, we must initially decide whether Defendant's actions pertaining to the aggravated kidnapping of Dotson were merely "incidental" to his

commission of the other crimes. We find that they were not. The removal of Dotson by Defendant and Hailey to the lake was not necessary for the commission of either the murder or the robbery. Likewise, the killing and robbery were not necessary to commit the kidnapping. Accordingly, the aggravated kidnapping was independent of both the murder and the robbery.

After determining that the movement or confinement [kidnapping] was beyond that necessary to consummate the concurrent felonies, the next inquiry is whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm. Id. In the instant case, these questions are all answered in the affirmative. Indeed, transporting Dotson to a deserted lake in the middle of the night gave him little hope of summoning help and also protected the defendants from easy detection. Removing Dotson to the lake also increased his risk of harm. It was clearly easier to shoot, beat, and drown Dotson while located in a secluded spot. For the forgoing reasons, we find Defendant's prosecution for aggravated kidnapping as a separate crime does not constitute a due process violation under Anthony.

Furthermore, Defendant's reliance on Rolland is misplaced because the facts presented by Defendant's case are simply not analogous to those in Rolland. The victims in Rolland were not transported more than a few feet or confined for more than a few minutes. By contrast, Dotson's confinement occurred at a significant distance from his home and for a substantial period of time. Defendant's contention that Dotson's confinement was short because he died quickly is also without merit. According to the testimony of Dr. Gerber, at the time when Dotson was beaten and loaded, unconscious, into the trunk of Defendant's car, the blood spatter which resulted indicated that his heart was probably still pumping. Neither defendant inspected Dotson's body to positively ascertain his life status during the incident. Our current aggravated kidnapping statute does not require a particular distance of removal or any specific duration or place of confinement to find guilt for the crime. Dixon, 957 S.W.2d at 532. Finally, the Rolland court found that the victims' confinement was for the express purpose of facilitating the defendant's getaway and that the victims did not suffer additional harm as a result. The same situation was not present in Defendant's case.

## 2. Legal Sufficiency of the Evidence

Defendant also contends that his conviction for facilitation of aggravated kidnapping was unsupported by the evidence adduced at trial. The standard used in determining sufficiency of evidence is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found *the essential elements of the crime* beyond a reasonable doubt. State v. Shepherd, 902 S.W.2d 895, 903 (Tenn. 1995) (emphasis added). The accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Defendant has not met this burden.

Aggravated kidnapping is defined, in relevant part, under Tennessee law as "false imprisonment, as defined in § 39-13-302, committed . . . [t]o facilitate the commission of any felony or flight thereafter . . . ." See Tenn. Code Ann. § 39-13-304(a)(1) (1997). Section 39-13-302 provides that "false imprisonment" occurs when one "knowingly removes or confines another

-11-

unlawfully so as to interfere substantially with the other's liberty." See id. § 39-13-302(a). "Unlawful means, with respect to removal or confinement, one which is accomplished by force, threat, *or fraud* . . . ." See id. § 39-13-301(2) (emphasis added). Criminal responsibility for "facilitation" of a felony attaches when, "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." See id. § 39-11-403.

Contrary to Defendant's claims, the evidence adduced at trial clearly shows that the elements of aggravated kidnapping were satisfied in Defendant's case. Defendant and Hailey knowingly and unlawfully removed Dotson from his home by fraud when they used a phony story to lure him to the lake to murder him. Dotson's removal and/or confinement also interfered substantially with his liberty. When Dotson became frustrated with waiting, he was beaten, shot, and drowned, all actions which constitute the commission of a felony offense. See id. § 39-13-304(a)(1), 302(a).

The record further reveals that the evidence was sufficient for a rational jury to find that Defendant was responsible for "facilitation" of the crime or, more particularly, that Defendant knew Hailey "inten[ded] to commit a specific felony" and knowingly furnished "substantial assistance in the commission of [said] felony" pursuant to Tenn. Code Ann. § 39-11-403. Specifically, Hailey testified that after he and Defendant discussed Hailey's dislike for Dotson, Hailey suggested they kill him and Defendant did not hesitate to respond, saying, "let's do it." Afterward, Defendant drove Hailey to secure a weapon to commit the murder. Defendant further assisted Hailey by helping to lure Dotson to the scene of the crime and, again, by drowning Dotson. In sum, when all of the evidence is viewed in the light most favorable to the State, we conclude that the evidence is sufficient for a rational jury to find beyond a reasonable doubt that Defendant was guilty of facilitation of aggravated kidnapping. Defendant is not entitled to relief on this issue.

### C. Especially Aggravated Robbery

Defendant further contends that the State's proof is insufficient to support his conviction for especially aggravated robbery. Specifically, Defendant argues that no proof was presented during the trial that either he or Hailey possessed any intent to rob Dotson and, since Dotson was dead when the money was taken, the statutory requirements of theft by violence or putting the person in fear are not satisfied. We disagree.

Especially aggravated robbery is "robbery as defined in § 39-13-401: (1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403 (1997). Tennessee Code Annotated § 39-13-401 defines robbery as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." The theft of property must be the result of the force or fear or must have been facilitated or made less difficult by the violence. State v. Owens, 20 S.W.3d 634, 639 (Tenn. 2000) (citing Register v. State, 97 So.2d 919, 921-22 (1957)). "[T]he plain meaning of violence as used in the offense of robbery pursuant to Tenn. Code Ann. § 39-13-401 is evidence of physical force unlawfully exercised so as to damage, injure or abuse." State v. Fitz, 19 S.W.3d 213, 216 (Tenn. 2000).

The State argues that intent to rob can be formed either prior to, during, or after the acts which caused serious bodily injury. In support of its argument, the State cites our decision in State v. Ctjuan D. James, No. 02C01-9605-CR-00173, 1996 WL 654329, Shelby County (Tenn. Crim. App., Jackson, Nov. 12, 1996), perm. to appeal dismissed (Tenn. 1997). In James, we decided that "[e]specially aggravated robbery merely requires that (1) the victim was robbed; (2) the robbery was accomplished by use of a deadly weapon; and (3) the victim suffered serious bodily injury." Id. at *1. The James Court further stated that it was "unpersuaded by the appellant's argument that the state must show that the intent to rob preceded the acts causing serious bodily injury." Id.

Defendant also argues that, since Dotson was dead when the money was taken, the statutory requirements of theft by violence or putting the person in fear were not satisfied. This argument is contradicted by the facts when viewed in the light most favorable to the State. The evidence showed that Dotson experienced great violence to his person *before* the robbery. In Tennessee, the act of violence or of putting a person in fear must precede or be concomitant to or contemporaneous with the taking of property to constitute robbery under Tenn. Code Ann. § 39-13-401. State v. Owens, 20 S.W.3d 634, 637 (Tenn. 2000). Since the evidence when viewed in the light most favorable to the State shows that violence preceded the theft of the victim's property in Defendant's case, this argument is without merit.

As a matter of fact, the evidence that Hailey and Defendant committed especially aggravated robbery is overwhelming. As previously stated, proof that Dotson feared for his life and suffered great violence before his ultimate death was unquestionable. Equally apparent was proof of the use of a deadly weapon and that the victim suffered serious bodily injury. Defendant also admitted to possessing Dotson's money. Although Defendant claimed that it was Hailey and not he who picked up the money that fell from Dotson's sock, questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are questions for the trier of fact, not this Court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

Accordingly, when all of the evidence is viewed in the light most favorable to the State, we find that it is clearly sufficient for a rational jury to find beyond a reasonable doubt that Defendant committed the offense of especially aggravated robbery. Defendant is not entitled to relief on this issue.

## III. RULE 29 MOTION FOR ACQUITTAL

Defendant contends that the court erred by not granting Defendant's motion for judgment of acquittal based on the fact that the State failed to corroborate the testimony of the co-defendant. Defendant argues that the rule of corroboration requires evidence independent of the testimony of an accomplice and because the State failed to meet this requirement, there is insufficient evidence to connect Defendant with the commission of the crimes. We disagree.

In Tennessee, it is well-settled that a defendant cannot be convicted on the uncorroborated testimony of an accomplice. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn.1994). Tennessee courts have discussed the nature of the rule as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

Id. (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). In effect, the rule of corroboration provides that "only slight circumstances are required to corroborate an accomplice's testimony." State v. Griffis, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). Whether an accomplice's testimony has been sufficiently corroborated is a question for the jury. Bigbee, 885 S.W.2d at 803.

We conclude that the independent evidence in this case is sufficient to establish more than the "slight circumstances" necessary to corroborate Hailey's testimony and connect Defendant with the commission of the crimes. First, the evidence showed that blood of the victim was discovered in Defendant's car. Second, Robert Taylor testified that he overheard Defendant participating in the conversation devised to lure Dotson to the murder site. Third, Defendant's own testimony confirmed that he aided Hailey in the commission of the offenses: Defendant drove to and from the murder scene, was present during the assaults and robbery, assisted in concealing and/or destroying evidence (namely, the body and murder weapon), then participated in the ensuing cover-up and lied to the police. We conclude that while this evidence may not be conclusive, in and of itself, to support a conviction, the evidence definitely "tends to connect the defendant with the commission of the offense[s]." Id. As a result, we find that Hailey's testimony was sufficiently corroborated. Defendant is not entitled to relief on this issue.

## IV. EXCLUSION OF EVIDENCE

Defendant argues that the court erred when it denied his motion to admit "exculpatory evidence" at trial and that this failure entitles Defendant to a new trial. We disagree.

-14-

The exculpatory evidence that Defendant refers to is a tape that Detective Putnam made of his interview with the co-defendant's mother. The record shows that during Defendant's cross-examination of Detective Putnam, Defendant desired to question Putnam regarding his interview with Ms. Hailey. The State objected on grounds that the testimony constituted inadmissible hearsay evidence. The trial judge allowed Defendant to proceed, but restricted the questions to "one or two points" about the interview. Defendant asked Putnam whether Putnam recalled Ms. Hailey stating that, during the co-defendant's confession to her immediately following the crimes, the co-defendant failed to mention Defendant "doing anything." When Putnam did not recall Ms. Hailey's statement, Defendant made a motion to play the tape of Putnam's interview with Ms. Hailey. Again, the State objected on grounds that the evidence was inadmissable as hearsay and suggested that Defendant instead call Ms. Hailey as a witness. The judge ruled that Putnam could use the tape to refresh his recollection. After the tape was played in-court but out of the presence of the jury, the trial judge concluded that the taped interview may include pertinent information. The trial court further concluded that, since the testimony was not offered to prove the truth of the matter asserted, it was not "hearsay" as defined in the Tennessee Rules of Evidence 801.

The jury was then readmitted to the courtroom and Defendant proceeded with his cross-examination. Putnam testified that Ms. Hailey had informed him that her son did not mention Defendant "doing anything" during his confession to her. She told Putnam that her son said that "he shot [Dotson] and threw him in the river," that he threw the gun into the river, and that now, "without Joe, [his sister] could find someone who really loved her."

During redirect examination, Putnam's testimony revealed that Hailey's confession to his mother omitted numerous significant details regarding the events that occurred the night of the killing. For example, Ms. Hailey stated that her son gave her money but did not tell her where it came from; her son also told her that he shot Dotson but failed to mention anything about drowning him in the river and/or the lake; and, finally, her son did not mention anything about stuffing Dotson into the trunk of a car and driving him around. Putnam further testified that Ms. Hailey used the pronoun "they" when relating many of the events as told her by her son. For example, she said that "they went by and picked him up" and "they were going to see people about a car." From this, Putnam admitted that he inferred that Ms. Hailey was speaking about her son in conjunction with Defendant, since she began using the pronoun after Putnam mentioned Defendant's name.

At the end of the State's redirect examination, the Court asked Defendant whether he had "anything further." Defendant's counsel answered in the negative. At no point during the court's discussion of the interview tape did Defendant object to the trial court's rulings.

The admission or exclusion of evidence at trial is largely discretionary with the trial judge and will not be disturbed on appeal unless there is clearly an abuse of discretion. State v. Gray, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997) (citing State v. Hayes, 899 S.W.2d 175, 183 (Tenn. Crim. App. 1995); State v. Griffis, 964 S.W.2d 577 (Tenn. Crim. App. 1997). Here, the trial court was presented with evidence that was arguably hearsay. Hearsay is inadmissible under Tennessee's rules of evidence unless an exception is applicable or no objection is made. See Tenn. R. Evid. 801, 803; State v. Smith, 24 S.W.3d 274, 280 (Tenn. 2000). The trial judge determined that Defendant could

ask limited questions of Putnam concerning his taped interview without violating the rules against hearsay. In doing so, the trial judge made considerable efforts to accommodate Defendant's desire to present the information contained on the tape to the jury and, as a result, the relevant parts of Ms. Hailey's testimony which Defendant sought to present to the jury were heard in court. Therefore, even if it were error to exclude the whole of the taped evidence, the error would be harmless. See Tenn. R. Crim. P. 52(a). The gist of the testimony that was relevant and helpful to Defendant's case was presented through the testimony of Detective Putnam during his cross-examination. We find no abuse of discretion by the trial court and, therefore, no reason to disturb its ruling. Defendant is not entitled to relief on this issue.

## V. FAILURE TO CHARGE LESSER-INCLUDED OFFENSES

Defendant also contends that the trial court erred when it failed to instruct the jury on the lesser-included offenses of voluntary manslaughter and facilitation to commit voluntary manslaughter. We disagree.

A trial court's duty to give a complete charge of the law applicable to the facts of the case as well as the law of each offense "included" in an indictment has been statutorily mandated in this State for some time. See State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999) ("a trial court must instruct the jury on all lesser-included offenses if the evidence introduced at trial is legally sufficient to support a conviction for the lesser offense"); State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); Tenn. Code Ann. § 40-18-110(a) (1997). This requirement to charge lesser-included offenses applies whether or not a defendant requests such an instruction. Burns, 6 S.W.3d at 464. As a logical corollary to this rule, there is no duty to charge the jury on offenses which do not fit the definition of lesser-included offenses. See id. Similarly, an instruction is not required if there is no evidence in the record to support a conviction for the lesser offense. See State v. Smiley, ___ S.W.3d ___, No. E1997-00054-SC-R11-CD, 2001 WL 69217 at *3 (Tenn. Jan. 30, 2001).

The governing standard for determining whether a lesser offense is a lesser-included of another and, therefore, may be charged to the jury was established in State v. Burns, 6 S.W.3d 453 (Tenn. 1999). The Burns standard is a two-prong test. The first prong determines whether an offense is a lesser-included offense of another. Id. at 467. If satisfied, the second prong resolves the question whether a jury instruction on such offense is justified, i.e., whether any evidence exists that reasonable minds could accept as to the lesser-included offense. Id. at 469. In resolving this query, the court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense to determine whether the proof is legally sufficient to support a conviction. Id. In other words, the mere existence of a lesser offense is not sufficient to warrant a charge–the final resolution depends on whether proof in the record would support a conviction.

The Burns test is designed so that meeting the requirements of any one of three parts, (a), (b), or (c), is sufficient to find a lesser-included offense. Under part (b), an offense is a lesser-included offense "if it fails to meet the definition in part (a) [requiring that all of its statutory elements are included within the statutory elements of the offense charged] only in the respect that it contains a statutory element or elements establishing (1) a different mental state indicating a lesser

-16-

kind of culpability; and/or (2) a less serious harm or risk of harm to the same person, property or public interest . . . ." Id. at 466-67. An offense is a lesser-included offense under part (c) if the lesser offense consists of "(1) facilitation of . . . or (2) an attempt . . . or (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b) . . . ." Id.

Voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211 (1997). A person is "criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony . . . the person knowingly furnishes substantial assistance in the commission of the felony." See id. § 39-11-403.

Under Burns, voluntary manslaughter and facilitation of voluntary manslaughter are lesser-included offenses of second degree murder. See State v. Dominy, 6 S.W.3d 472, 477 n.9 (Tenn. 1999). Voluntary manslaughter satisfies section (b)(1). It contains all of the statutory elements of second degree murder, differing only in the respect that it requires a different mental state indicating a lesser kind of culpability, namely passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner. Facilitation of voluntary manslaughter falls squarely into part (c)(1).

Nevertheless, we conclude that Defendant was not entitled to a jury instruction on either voluntary manslaughter or facilitation of voluntary manslaughter. This is because we find that the second prong of the Burns test was not satisfied. Even taken in the light most favorable to the existence of the lesser-included offenses, the facts and circumstances of Defendant's case did not present any proof that Defendant acted in a state of passion or out of provocation when he committed his offenses. Thus, there was not sufficient evidence that reasonable minds could accept as to the lesser-included offense of voluntary manslaughter or facilitation of voluntary manslaughter. Defendant is not entitled to relief on this issue.

## VI. SENTENCING

Defendant argues that the sentences imposed by the trial court are improper. Specifically, Defendant contends that the trial court erred when it applied the enhancement factor in Tennessee Code Annotated § 40-35-114(5), which requires that court find that the defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense. Defendant argues that this enhancement factor is inapplicable because the State could not prove that the victim was alive to actually suffer. Defendant also argues that the trial court erred when it ordered consecutive sentencing based on his status as a dangerous offender.

When an accused challenges the length, range, or the manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). This

presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In conducting a de novo review of a sentence, this court must consider (a) the evidence, if any, received at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement that the defendant made on his own behalf; and (g) the potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, 103, 210 (1997). See State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and made findings of fact that are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

## A. Sentencing Enhancement Factor

Defendant first argues that the court erred when it applied enhancement factor Tenn. Code Ann. § 40-35-114(5), which requires proof that the defendant treated or allowed the victim to be treated with exceptional cruelty while committing the offense, because the State did not prove that the victim was alive to actually suffer. We disagree.

When calculating the sentence for a felony conviction, the presumptive sentence for a Class A felony is the midpoint in the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c) (1997). If there are enhancement factors but no mitigating factors, the trial court may set the sentence above the presumptive sentence but still within the range. Id. § 40-35-210(d). A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Id. § 40-35-210(e). The sentence may then be reduced within the range by any weight assigned to the mitigating factors present. Id.

The record clearly shows that at the conclusion of the sentencing hearing, the trial court applied one enhancement factor, i.e., the defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense. See id. § 40-35-114(5). From the record, it appears that the trial court applied this factor only to the sentence for second degree murder. The reasons underlying the trial court's determination of Defendant's remaining two sentences (for facilitation of aggravated kidnapping and especially aggravated robbery) is less clear. According to the record, no enhancing factors were applied to the other two convictions. The court also found that no mitigating factors applied in Defendant's case.

First, we address application of 40-35-114(5) to Defendant's sentence for second degree murder. We agree with the trial court that treatment of the victim with exceptional cruelty is not an element of the offense of second degree murder. See id. § 39-13-210. Moreover, the "exceptional cruelty" factor has been found to apply in cases dealing with abuse or torture. State v. Alvarado, 961 S.W.2d 136, 151 (Tenn. Crim. App. 1996) (citing State v. Davis, 825 S.W.2d 109, 113 (Tenn. Crim. App. 1991)). When applying this particular enhancement factor, a trial court "should state what actions of the [d]efendant, apart from the elements of the offense constituted 'exceptional cruelty.'" State v. Goodwin, 909 S.W.2d 35, 45-46 (Tenn. Crim. App. 1995). Here, the trial court did so. During the sentencing hearing, the trial court stated that Defendant's case "was, without any doubt, a senseless and brutal killing." We agree. The trial court further observed that the "way the man was treated, beaten, shot, thrown in the river, taken out of the river, put in the trunk of the car, all of that was extremely cruel without any question." At the conclusion of the hearing, the trial court imposed the maximum sentence in the range for the offense of second degree murder, twenty-five years. In sum, the record reveals that the trial court stated what actions of Defendant constituted "exceptional cruelty" and also made sufficient findings of fact to properly apply this factor to Defendant's sentence for second degree murder. By contrast, we find unpersuasive Defendant's argument that dead men do not suffer.

Regarding Defendant's sentence for facilitation of aggravated kidnapping, the record contains the following statement by the trial court: "[a]s far as Facilitation to Commit Aggravated Kidnapping is concerned, the Court believes that the appropriate sentence is a five-year sentence." This statement constitutes the extent of the trial court's discussion of this particular matter. When a trial court imposes a sentence, it is required to place in the record what enhancement factors it found, if any, as well as the findings of fact it used to determine the length of the defendant's sentence. See Tenn. Code Ann. § 40-35-209 and -210(f) (1997). The presumptive sentence for a defendant convicted of a Class C felony is the minimum in the range of 3 to 6 years. See id. § 40-35-112(a)(3), and -210(c). Here, the trial court clearly added two years to Defendant's presumptive sentence without stating the findings of fact it used to enhance Defendant's sentence. Nevertheless, an appellate court conducting a de novo review is not precluded from applying an enhancement factor that was not applied by the trial court so long as the facts were established in the record by a preponderance of the evidence, and that this is so found by the trial court. State v. Winfield, 23 S.W.3d 279, 281 (Tenn. 2000). The fact that Defendant treated his victim with exceptional cruelty during the kidnapping and subsequent murder was firmly established at trial, and the trial court also expressly made this finding of fact at the sentencing hearing during its discussion of Defendant's sentence for second degree murder. Importantly, Defendant did not dispute the evidence that his victim was treated with exceptional cruelty. He merely argued that because Dotson was dead, Dotson could not have suffered as required to apply this factor. However, as previously stated, Defendant's argument that dead men do not suffer is unpersuasive. Because we concluded that the facts necessary to apply enhancement factor 40-35-114(5) were established in the record by a preponderance of the evidence, it is within the authority of this Court to apply enhancement factor 40-35-114(5) to Defendant's sentence for facilitation of aggravated kidnapping. See Winfield, 23 S.W.3d at 281. In doing so, we enhance Defendant's sentence two years for this offense, affirming the sentence of five years imposed by the trial court.

Since the record shows that Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, we further conclude that enhancement factor 40-35-114(1) is applicable to all of Defendant's sentences. See Winfield, 23 S.W.3d at 281. This finding is based upon the undisputed evidence of Defendant's conviction for assault on September 5, 1995 as contained in the pre-sentence report. In sum, we affirm the lengths of Defendant's three sentences, noting that the trial court did not enhance Defendant's sentence of twenty years for especially aggravated robbery from the presumptive sentence provided by statute.

### B. Consecutive Sentencing

Defendant also argues that the trial court erred when it ordered his sentence for the second degree murder conviction to run consecutively to his sentence for the facilitation of aggravated kidnapping conviction. Defendant claims that his status as a "dangerous offender" is unwarranted and, therefore, consecutive sentencing is improper. Based upon the record, we are unable to determine whether Defendant's consecutive sentencing was proper. We therefore remand this issue to the trial court for further findings consistent with this opinion.

In this case, non-mandatory consecutive sentencing is governed by Tennessee Code Annotated section 40-35-115. According to that statute, the trial court has the ability to order consecutive sentencing where a defendant is convicted of more than one criminal offense and the court finds that one or more of the required statutory criteria exist. Tenn. Code Ann. § 40-35-115(a) (1997); State v. Black, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). For instance, the trial court may order consecutive sentencing if the defendant is a "dangerous offender" whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Id. § 40-35-115(b)(4). When this factor is used, the court is required to determine that consecutive sentences (1) are reasonably related to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). Therefore, satisfying the definition of subsection 40-35-115(b)(4) is not, in and of itself, "sufficient to sustain consecutive sentences." Id. at 938.

In order to limit the use of the "dangerous offender" category to cases where such "particular facts" exist, our supreme court held that *sentencing courts must make specific findings* regarding the severity of the offenses and the necessity to protect society before ordering consecutive sentencing under Tenn. Code Ann. § 40-35-115(b)(4). Id. at 939 (emphasis added). The requirement that a court make these specific findings before imposing a consecutive sentence on a "dangerous offender" arises from the fact that, "of all of the categories for consecutive sentencing, the dangerous offender category is the most subjective and hardest to apply." State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

Here, the record shows that in determining whether to impose partial consecutive sentencing, the trial court found that section 40-35-115(b)(4), concerning whether Defendant was a dangerous offender with little regard for human life and no hesitation about committing a crime

in which the risk to human life is high, applied. However, the record does not reveal that the trial court made specific findings regarding the severity of the offenses and the necessity to protect society before ordering consecutive sentencing. As previously stated, when section 40-35-115(b)(4) is used, the court is required to determine that consecutive sentences (1) are reasonably related to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing in accordance with State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn.1995). Mere classification of Defendant as a "dangerous offender" is not sufficient to sustain consecutive sentences. Id. at 938.

Moreover, after reviewing the record, it appears that the trial court gave significant weight to the co-defendant Hailey's sentence when determining the total length of Defendant's sentence. As an illustration, the trial court stated the following: "the Court, while finding and – acknowledging that Jeremiah Hailey was probably the one that got this thing set in motion, finds that both of these defendants are equally responsible for the senseless, brutal death of this young man." In its conclusion, the trial court further stated that Defendant's "aggregate sentence in this case is going to be exactly the same as the co-defendant, Jeremiah Hailey, for this man's participation in killing this other young man . . . [a]nd I think *they both should have an equal sentence*. And that sentence is an aggregate sentence of 30 years . . . ." (Emphasis added.)

Each person convicted of a crime must be separately sentenced based upon the facts and circumstances contained in the record. State v. Griffis, 964 S.W.2d 577, 604 (Tenn. Crim. App. 1997). Therefore, each defendant is sentenced based on the facts presented in his or her own case, and the sentence of a co-defendant should have no bearing on the length of another's sentence.

In sum, because the trial court found that Defendant was a "dangerous offender whose behavior indicates little or no regard for human life[and] no hesitation about committing a crime in which the risk to human like is high," but failed to make further specific findings regarding whether Defendant's case was appropriate for consecutive sentencing in accordance with the holding in Wilkerson, we cannot affirm the trial court's judgment imposing consecutive sentences. Accordingly, we affirm Defendant's convictions and the length of Defendant's sentences, but, reverse the order of consecutive sentencing and remand to the trial court for a new hearing solely on the issue of consecutive or concurrent sentencing. Either party aggrieved by the trial court's decision may thereafter appeal from the order setting concurrent or consecutive sentencing.

## VI. CONCLUSION

After reviewing the briefs, the record, and the governing law, the convictions are affirmed, and the lengths of each sentence are affirmed. The order of consecutive sentencing is reversed and remanded for a new hearing solely on the issue of concurrent or consecutive sentencing.

_____
THOMAS T. WOODALL, JUDGE